UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

    Plaintiff,

       v.

GABRIEL POLANCO PLANAS,

    Defendant.

CRIMINAL No. 17-619 (JAG)

## REPORT AND RECOMMENDATION

### I. Procedural Background

Pending before the court is a motion to suppress by Gabriel Polanco Planas ("Defendant"). ECF No. 43. On December 7, 2017, Defendant was indicted for one count of conspiracy to possess with the intent to distribute cocaine in violation of Title 21, United States Code, Sections 846 and 841(a)(1) and (b)(1)(c). ECF No. 9. On March 8, 2019, Defendant filed the motion pending before the court seeking to suppress all statements he made in an interview room at the Luis Muñoz Marín International Airport in Carolina, Puerto Rico ("the Airport"). ECF No. 43, at 1-2. The United States of America ("the Government") subsequently filed a response in opposition. ECF No. 45. A suppression hearing was held on December 10, 2019. ECF No. 87.

### II. Factual Background

On December 1, 2017, approximately eight agents from the Airport Investigations and Tactical Team ("AirTAT") were conducting surveillance at the Airport for drug proceeds from an inbound flight from Newark, described by DEA Special Agent Yasmín García ("Agent García") as a demand city for drugs from Puerto Rico. Hr'g, Dec. 10, 2019 at 10:38-39 AM.

AirTAT is composed of agents from the Drug Enforcement Administration, Federal Bureau of Investigations, U.S. Department of Homeland Security, and Customs and Border Patrol and its mission is to combat drug trafficking and money laundering at the Airport.

AirTAT agents were stationed at the JetBlue baggage claim area when they observed Defendant and Mr. Erick Rivera ("Mr. Rivera") talking to one another and scanning the area. Defendant and Mr. Rivera pulled four bags each from the luggage carousel (eight bags in total) and walked separately towards the exit. Two AirTAT Task Force members, DEA Special Agents García and Lilliam Carbonell ("Agent Carbonell"), approached Defendant as he was walking to the exit at approximately 1:25 PM. Id. at 10:35 AM. The agents identified themselves as law enforcement and requested his identification and boarding pass.[1] Defendant was questioned where he was coming from and "if he was carrying any explosives, firearms, narcotics, or large amounts of United States currency." Id. at 9:17 AM. Defendant replied he was not carrying "any contraband or large amounts of United States currency." Id. at 9:17 AM. The tone of the encounter was "casual, it was calm." Id. at 9:18 AM.

The agents also asked Defendant if they could conduct a K-9 sniff of his suitcases. Defendant consented and the K-9 sniffed the suitcases. The K-9 handler gave a signal to the agents that the K-9 had alerted positive.[2] Following the positive alert, Defendant consented to the search of his suitcases and the agents only found "miscellaneous clothing items" inside them. Id. at 9:21 AM. Agent Carbonell asked Defendant if he would accompany them to a more secure area for further questioning and told him that "he wasn't under arrest and he was free to leave."

---

[1] This conversation and all interactions with Defendant were conducted in Spanish. Agent Carbonell is fluent in Spanish. When questioned by defense counsel whether Agent García is fluent in Spanish, Agent García testified "it sometimes come out weird, so [Agent Carbonell] has to help and then explain." Hr'g, Dec. 10, 2019 at 10:28 AM.

[2] At the time of the K-9 sniff, Agent García believed the K-9 was a narcotics K-9; however, she later learned that the K-9 was a firearms K-9. Hr'g, Dec. 10, 2019 at 9:19 AM.

Id. at 9:24 AM. Defendant consented to the request and he walked with Agents Carbonell and

García to the Customs and Border Protection ("CBP") section of the airport. They walked past

the check-in area and proceeded through secured doors which required keypad code access.

However, the area behind the door could be accessed from the inside by passengers that had

arrived from international flights. Defendant was not restrained and maintained control of his

suitcases during the walk to the interview room. Id. at 9:27 AM.

The small interview room contained a table and a few chairs that could fit five persons.

Agent Carbonell again reiterated to Defendant that he was "not under arrest" and that he "was

free to leave." Id. at 9:31 AM. Approximately thirty minutes had passed from the agents' initial

encounter with Defendant at the baggage claim area to the time they arrived at the interview

room. Id. at 9:28 AM.

Upon entering the interview room, Defendant signed a consent to search form that only

listed his cellphone,[3] yet Defendant's suitcases were searched for a second time. See ECF No.

90-1. After the search did not yield any new items, Agents García and Carbonell began to

interview Defendant. The tone of the interview was "calm." Id. at 9:32 AM. The agents

questioned Defendant for approximately three to four hours and they learned that he was paid

$5,000 to "take the suitcases to New York" and bring them back to San Juan. Id. at 9:33-35 AM.

Agent García testified that the conversation was "intriguing, but it had a lot of holes in the story,

there were a lot of important details that we didn't know" and she had the impression that

Defendant was leaving things out. Id. at 9:35 AM. Special Agent Javier Calzada entered the

---

[3] At the hearing, Agent García testified that Defendant had signed a consent to search form for the suitcases. Hr'g, Dec. 10, 2019 at 9:52-53 AM. A form consenting to the search of the suitcases, however, was not introduced into evidence.

interview room "sometime between the middle to the end" of the pre-Miranda advice of rights period of questioning and also asked Defendant questions. Id. at 9:37 AM.

According to Agent García, "[t]he direction of the interview changed when [Defendant] stated that what he believed in his suitcases that he took up to New York was perico, which . . . is slang for cocaine."[4] Id. at 9:38 AM. Agents García and Calzada left the interview room to call an Assistant United States Attorney ("AUSA") while Agent Carbonell remained in the interview room with Defendant. After consulting with an AUSA, Agents García and Calzada returned to the interview room and "advised [Defendant] he was under arrest and he couldn't leave, and we also gave him his Miranda warnings verbally and on a piece of paper." Id. at 9:39 AM. Agent Calzada read Defendant his Miranda rights, and Defendant was given a Miranda waiver form which he read and signed at approximately 5:55 PM.[5] Id. at 9:42 AM; 11:20 AM; ECF No. 88-2. Approximately ten minutes had passed from when Defendant said the word "perico" to when he was read his Miranda rights.[6] Id. at 9:39 AM.

During the post-Miranda period of the interview, Defendant told agents more details about his trip to New York including "who dropped him off, when he got the suitcases, the description of the cars, individuals that were there in the parking garage that gave him the suitcases, him checking in, him getting to the airport, everything up until basically when we did our initial encounter with him." Id. at 9:46 AM. Defendant remained unhandcuffed and agents García, Calzada, and Carbonell were in the interview room with him for the post-Miranda interview period. Id. at 9:46-47 AM.

---

[4] The Government and Defendant stipulated that "perico" is slang for "cocaine." Hr'g, Dec. 10, 2019 at 9:05 AM.
[5] Agent Calzada read Defendant his Miranda rights in Spanish and the Miranda waiver form presented to Defendant was in Spanish. See Govt. Ex. 1-a. Agent Colsada is fluent in Spanish. Hr'g, Dec. 10, 2019 at 11:20 AM.
[6] According to Agent García, she did not read Defendant his Miranda rights earlier because "I didn't believe we were going to arrest him." Hr'g, Dec. 10, 2019 at 9:40-41 AM. She also stated, "this is the only time we've ever arrested anyone [in a case where no drugs are found in the luggage]. I wasn't going in there with the mindset that we were going to arrest him, just that we were getting his story on what the money was for." Id.

### III. Legal Analysis

Defendant is only seeking to suppress his statements that occurred in the CBP interview room. ECF No. 43, at 1-2. Defendant is not seeking to suppress statements that occurred at the JetBlue baggage claim area. Hr'g, Dec. 10, 2019 at 11:40 AM. Nor is Defendant alleging that the agents did not ever read him his Miranda rights, that he did not understand his Miranda rights, or that the waiver of his Miranda rights was coerced. Id. at 11:39-40 AM; 12:03-04 PM. Defendant is simply arguing that he should have been read his Miranda rights the moment he arrived in the interview room. Id. at 12:04-05 PM. The Government, on the other hand, argues that Defendant was not under custodial interrogation that required Miranda warnings when he arrived in the interview room. Id. at 11:55-56 AM.

 "The police are required to provide a Miranda warning before subjecting a suspect to custodial interrogation." United States v. Swan, 842 F.3d 28, 31 (1st Cir. 2016). "Both 'custody' and 'interrogation' must be present to require Miranda warnings." See United States v. Molina-Gomez, 781 F.3d 13, 22 (1st Cir. 2015) (citations omitted). Accordingly, Miranda warnings are required when a person is a (1) suspect, (2) subjected to state interrogation, and (3) under custody. See, e.g., id.; United States v. Ventura, 85 F.3d 708, 710 (1st Cir. 1996).

#### A. Whether Defendant was a Suspect

A person becomes a suspect when he is the focus of a criminal investigation. See Stansbury v. California, 511 U.S. 318, 323 (1994). In the case at bar, Agents García and Carbonell initiated an encounter with Defendant at the JetBlue baggage claim area. The agents questioned him where he was coming from and asked for his identification. Defendant was not a suspect at this time because the agents were not targeting any specific individual that day and did not have any information connecting Defendant to criminal activity. Hr'g, Dec. 10, 2019 at 9:13

AM. However, Defendant became a suspect when the K-9 alerted positive after sniffing his four

suitcases. Newark was a known "demand city" for drugs from Puerto Rico and the agents were

monitoring the inbound flight from Newark for drug proceeds. Thus, Defendant became the

focus of a criminal investigation related to drug trafficking the moment that the agents

reasonably believed the K-9 alerted positive for narcotics. See Stansbury, 511 U.S. at 323. It is

immaterial for the purposes of establishing when Defendant became a suspect that it was a

firearms K-9 that alerted positive because the agents "at the time believed it was a narcotics K-

9." Id. at 9:19 AM. Therefore, by the time the Defendant arrived to the interview room he was

clearly a suspect.

### B. Whether Defendant was under State Interrogation

State interrogation under Miranda includes express questioning and "any words or

actions on the part of the police . . . that the police should know are reasonably likely to elicit an

incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). This

is an objective inquiry of whether the officer's statements and conduct could be perceived by a

reasonable person in the same circumstances as state interrogation. See Ventura, 85 F.3d at 711-

12; United States v. Melendez Santiago, 544 F. Supp. 2d 76, 79 (D.P.R. 2007). However, routine

questions such as a "suspect's name, address, and related matters" ordinarily do not constitute

interrogation. See United States v. Doe, 878 F.2d 1546, 1551 (1st Cir. 1989) (collecting cases).

In the case at hand, agents commenced a consensual encounter with Defendant at the

JetBlue baggage claim area and asked Defendant for his identification, where he was coming

from, and whether he was carrying any explosives, firearms, narcotics, or large amounts of

currency. The tone of the encounter was "casual, it was calm." Hr'g, Dec. 10, 2019 at 9:18 AM.

The questions asking Defendant for his identification and where he was coming from did not

constitute state interrogation because they were routine questions. See Doe, 878, F.2d at 1551. It

is not necessary, however, to determine whether the Defendant was under state interrogation at

the baggage claim area because the Defendant is not seeking to suppress any statements at said

area.

      Once the Defendant arrived to the interview room, he was clearly under state

interrogation because he was a suspect and the agents should have reasonably known that their

questions were likely to elicit an incriminating response. See Innis, 446 at 301. Defendant was

brought to the interview room following the positive alert from a K-9 that the agents reasonably

believed was a narcotics K-9. In the interview room, Defendant told agents that he was paid

$5,000 to take the locked suitcases to New York. Hr'g, Dec. 10, 2019 at 10:37 AM; 10:41 AM.

Agent García testified that the details described by Defendant were "courier characteristics," and

thus, she should have known that further questions into the matter were "reasonably likely to

elicit an incriminating response" from Defendant. Id. at 10:42 AM; see Innis, 446 U.S. at 301. A

reasonable person in Defendant's circumstances would believe he was under state interrogation.

See Ventura, 85 F.3d at 711-12. The agents, however, continued to question Defendant "to see

what [Defendant] said the money was regarding, or what his story was." Id. at 10:39 AM. These

questions constituted state interrogation as they sought to investigate drug trafficking or money

laundering activity.

      **C. Whether Defendant was under Custody**

      Defendant alleges that he was under custody the moment he arrived in the CBP interview

room. Hr'g, Dec. 10, 2019 at 11:40-41 AM, see ECF No. 43, at 2. The Government, however,

contends that Defendant was not in custody because he was never physically restrained, and he

was told repeatedly that he was free to leave. Hr'g, Dec. 10, 2019 at 11:58-59 AM. "Custody

exists where there is 'a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" See United States v. Molina-Gomez, 781 F.3d 13, 22 (1st Cir. 2015) (quoting United States v. Ventura, 85 F.3d 708, 710 (1st Cir. 1996)). "The relevant inquiry is whether, in light of the objective circumstances of the interrogation, a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." United States v. Swan, 842 F.3d 28, 31 (1st Cir. 2016) (citing Howes v. Fields, 565 U.S. 499, 509 (2012)). Several factors relevant to this determination are whether "the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." Swan, 842 F.3d at 31 (citations omitted).

Regarding the first factor, the location of the questioning, Defendant was questioned in an interview room at an international arrivals section of the Airport. The agents asked Defendant if he would accompany them to the secure area, but they specifically told him that he "wasn't under arrest and he was free to leave." Hr'g, Dec. 10, 2019 at 9:24 AM. The evidence suggests that Defendant arrived to the CBP interview room voluntarily because he was told he was free to leave, he was not restrained, and he remained in possession of his suitcases and cellphone. Id. at 9:31 AM. While the interview room was beyond a one-way exit, there was access to the area from the international arrivals terminal which made it a less secluded environment. Defendant's mere presence in the CBP interview room did not make the questioning custodial. See California v. Beheler, 463 U.S. 1121, 1125 (1983) ("Miranda warnings are not required 'simply because the questioning takes place in the station house . . .'"). The location of the questioning in the CBP interview room and the circumstances of how Defendant arrived there weigh in favor of the Government.

With regard to the second factor, the number of law enforcement officers present, approximately eight agents were conducting surveillance at the JetBlue baggage claim area when Defendant arrived on an inbound flight from Newark. However, Defendant was only approached and questioned by Agents Carbonell and García. A third agent, the K-9 handler, only approached Defendant at the baggage claim area so that the K-9 could conduct a sniff test of Defendant's suitcases after he consented. While Agent García was armed, she never drew her firearm and it was concealed on the small of her back covered by a backpack. Hr'g, Dec. 10, 2019 at 9:17 AM.

During the five-minute walk to the CBP interview room, Defendant was accompanied by just Agents García and Carbonell. The interview had one table, chairs, and enough room for five people. Defendant was only questioned by Agents García and Carbonell during the pre-Miranda interview period until Agent Calzada joined them halfway through this period. The post-Miranda interview was limited to the same three officers. The presence of three agents in the CBP interview room "was not overwhelming, lending support to a finding that the questioning was non-custodial." See United States v. Infante, 701 F.3d 386, 397 (1st Cir. 2012) (holding that presence of two officers, joined briefly by two others, was not overwhelming); see also Swan, 842 F.3d at 32 ("We have previously declined to find that a defendant was in custody even when confronted by as many as five police officers."). The number of law enforcement officers present was not coercive, and thus, the second factor weighs in favor of the Government.

The third factor, the degree of physical restraint, also favors the Government. Defendant was not physically restrained at the baggage claim area, during the five-minute walk to the interview room, or at any point during the questioning in the interview room. Id. at 9:23 AM; 9:32 AM; 9:45 AM. Furthermore, no agent made physical contact with Defendant or acted in a threatening manner. See United States v. Hughes, 640 F.3d 428, 436 (1st Cir. 2011) ("we think it

significant that no meaningful physical restraint was applied to the defendant . . . . [f]or aught

that appears, no officer made physical contact with him.").

The duration of the interview, which is the fourth factor, requires a closer examination.

Defendant and the agents arrived to the CBP interview room at approximately 2:00 PM, but

Defendant was not read his Miranda rights until approximately 5:55 PM. Hr'g, Dec. 10, 2019 at

11:53-54 AM; 9:39-40 AM. Therefore, Defendant was questioned at the interview room by

agents for almost four hours – a significant period of time. Id. at 9:35 AM. According to Agent

García, "he was providing information that kept us intrigued on what really happened, but time

just flew by." Id. at 9:31 AM; 9:36 AM.

Although duration seems to favor Defendant in isolation, the jurisprudence considers

duration in combination with the totality of circumstances. In United States v. Lanni, the

defendant filed a motion to suppress statements he made to two FBI Special Agents after he was

interviewed for approximately four hours in the living room of his home without being given any

Miranda warnings. 951 F.2d 440, 442 (1st Cir. 1991). The First Circuit found that the defendant

was not under custody but reasoned that "the facts of this case place it in the gray area where a

court, having the benefit of testimony and the 'feel' of the situation, could decide that the

interrogation was or was not custodial." Id. at 443. In United States v. Beverly, the First Circuit

held that a defendant was not in custody when he was questioned for three hours in a lawyer's

office by two IRS agents where the questions were not coercive in nature and the agents were not

overbearing in manner. No. 92-2478, 1993 WL 165348, at *3 (1st Cir. May 11, 1993). In United

States v. Baptiste, the defendant filed a motion to suppress his statements after two FBI Special

Agents interviewed him for three to four hours in his hotel room. Crim No. 17-10305, 2019 WL

2334107, at *1 (D. Mass. May 31, 2019). The District of Massachusetts held that the defendant

was not in custody and reasoned that "although the interview was somewhat lengthy and occurred late at night, the Special Agents maintained a 'courteous' tone and were 'calm' throughout the duration of the interview." Id. at *3. Lastly, in United States v. Casellas, the defendant was questioned in the hospital by two police officers for four hours in the morning and 90 minutes in the afternoon with approximately 90 minutes between the two interviews. 149 F. Supp. 3d. 222, 241 (D.N.H. 2016). The District of New Hampshire found that while the duration of the interactions with the defendant was lengthy, "the nature of the interviews was relaxed and cordial" and defendant was not under custody. [7] Id.

In the case at bar, although Defendant was questioned for approximately four hours in the room, he was not handcuffed during the interview, the agents did not display unholstered firearms, and the tone of the interview was calm. Hr'g, Dec. 10, 2019, at 9:31-32 AM. Thus, when examined in the context of the totality of the circumstances, the duration of interrogation in the interview room is insufficient to carry the day for the Defendant. See Lanni, 951 F.2d at 443; Beverly, 1993 WL 165348, at *3. Furthermore, even if it were determined that the length of the interrogation in this case is a factor that favors the Defendant, "[t]he duration of the encounter is "never a singly determinative factor." United States v. Ventura, 132 F.3d 844, 848 (1st Cir. 1998) (citations omitted).

The fifth factor inquires into the character and tone of the interview. The initial consensual encounter with Defendant at the JetBlue baggage claim area was "casual, it was calm." Hr'g, Dec. 10, 2019 at 9:18 AM. When Agent Carbonell asked Defendant to accompany them to a more secure area, Defendant was told he was not under arrest and he was free to leave.

---

[7] But see United States v. Mittel-Carey 493 F.3d 36, 40 (1st Cir. 2007) (The First Circuit found that a reasonable person awakened at 6:25 AM by law enforcement officers, one with an unholstered gun, who was interrogated for up to two hours and not permitted freedom of movement within his home was under custody.)

Id. at 9:24 AM. The tone at that moment was "the same, it was calm still, no one was demanding

or overbearing, authoritative. The tone the entire time was a conversation." Id. at 9:25 AM.

Inside the interview room, Defendant was advised for a second time that he was not under arrest

and that he was free to leave. Id. at 9:31 AM. Defendant remained unrestrained and maintained

possession of his cellphone and suitcases. Id. at 9:31 AM. According to Agent García, "the tone

remained the same, it was a calm environment, it hadn't changed from the initial encounter." Id.

at 9:31 AM. Defendant did not appear upset or agitated and he was "really respectful, he was

calm, very polite, he wasn't rude, he wasn't defensive." Id. at 9:32 AM. Agent Calzada's

demeanor matched everyone else's and "he wasn't aggressive or overbearing." Id. at 9:37-38

AM. The tone of the questioning did not change after Defendant was read his Miranda rights. Id.

at 9:45 AM.

The fifth factor weighs in favor of the Government. The interactions between agents and

Defendant at the JetBlue baggage claim were calm and conversational. The character and tone of

the interview remained conversational in the CBP interview room. See Swan, 842 F.3d at 33

(holding that interview was non-custodial where "the conversation was characterized by "a

generally even-tone back and forth."); United States v. Jones, 187 F.3d 210, 218 (1st Cir. 1999)

(holding that the officer's "normal tone of voice" during questioning was indicative that the

interview was non-custodial.).

After careful examination of the custodial factors, Defendant fails to prove that he was in

custody the moment he arrived in the CBP interview room. Defendant was told repeatedly that

he was free to leave, he was not physically restrained, and the tone and character of the interview

was calm. Defendant was not under custody until he stated that he believed that the suitcases had

contained "perico" and the agents consulted with an AUSA and then told Defendant that he was

"under arrest and he couldn't leave." Hr'g, Dec. 10, 2019 at 9:38-39 AM. Because the agents promptly read Defendant his <u>Miranda</u> rights when he came under custody, Defendant's motion to suppress should be denied. However, if any statements were made by Defendant after he acknowledged that he believed he was transporting "perico" and before he was read his <u>Miranda</u> rights, those statements should be suppressed because Defendant was in custody, as it is doubtful that he would have been let go prior to the AUSA's decision on whether to press charges. During the approximate ten-minute wait while the AUSA was being consulted, a reasonable person would not have felt that he was free to leave. <u>See</u> <u>Swan</u>, 842 F.3d at 31; <u>Molina</u>, 781 F.3d at 22.

## IV. Conclusion

For the foregoing reasons, it is hereby recommended that the pending motion to suppress (ECF No. 43) be DENIED, with the exception that if Defendant made any statements in the interview room after he said "perico" and before he was read his <u>Miranda</u> rights, those statements should be suppressed. The parties have fourteen (14) days to file any objections to this report and recommendation unless otherwise ordered by the court. Failure to file the same within the specified time waives the right to object to this report and recommendation. Fed. R. Civ. P. 72(b)(2); Fed. R. Civ. P. 6(c)(1)(B); D.P.R. Civ. R. 72(d); <u>see also</u> 28 U.S.C. § 636(b)(1); <u>Henley Drilling Co. v. McGee</u>, 36 F.3d 143, 150–51 (1st Cir. 1994); <u>United States v. Valencia</u>, 792 F.2d 4 (1st Cir. 1986).

IT IS SO RECOMMENDED

In San Juan, Puerto Rico, this 22nd day of January, 2020.

s/Marcos E. López
U.S. Magistrate Judge
